C. LEWIS WATJEN AND WILLIAM TOEL, partners, trading as Watjen, Toel & Co.,

*v.*

ASHBEL GREEN, receiver of the North River Construction Company.

1. A subscription agreement for railway bonds provided that the subscription price should be paid in installments upon call by the vendor, of which notice should be given, and also required the vendor, previous to any payments, to deposit all the bonds where they could at any time be had for delivery, and did not contain any expressions which would indicate that the provision for call had been inserted for the benefit of the vendor.—*Held*, that, without waiting for a call, the buyer was at liberty to, at any time, tender and pay the price agreed upon and demand the bonds subscribed for.

2. In executory agreements for the sale of chattels the obligation of the vendor to deliver, and that of the buyer to pay, are concurrent conditions in the nature of mutual conditions precedent, and neither vendor nor buyer can enforce the contract against the other without showing performance, or an offer to perform, or averment of readiness and willingness to perform upon his part.

On appeal from determination of receiver. ·

*Mr. Anthony Q. Keasbey* and *Mr. J. A. Shoudy*, for the appellants.

*John P. Stockton, Attorney-General,* and *Mr. Howard Mansfield,* for the receiver.

THE CHANCELLOR.

This appeal is from the disallowance of a claim presented to the defendant receiver, by Messrs. Watjen, Toel & Co., who allege themselves to be creditors of the North River Construction Company, an insolvent corporation. The principal business of the insolvent company was the construction of the New York, West Shore and Buffalo railway through the State of New York. In process of building that railway the insolvency occurred, and, upon application to this court, the defendant was appointed receiver.

The proofs exhibit that the construction company was paid for its work in building the railway in the stock and mortgage bonds of the railway company, and that it became necessary for it to find a market for large quantities of those securities.

Among other measures adopted by it in their disposition was a subscription agreement, known, in its affairs, as the agreement of June, 1881. That document, after reciting that the New York, West Shore and Buffalo Company proposed to build a railway from a point on the west side of the Hudson river, opposite the city of New York, to the city of Buffalo, a distance of four hundred and twenty-five miles, and to issue its bonds, secured by mortgage, payable in fifty years, bearing interest at the rate of five per cent. per annum, payable half yearly, and that the North River Construction Company had undertaken to build and equip the railway, and to take such bonds, and also capital stock of the railway company, in payment for its work, proceeded to bind the subscribers for valuable consideration paid to each of them, to pay the construction company par and accrued interest for the amounts of the bonds set opposite their re-

spective names, upon the following, among other, terms and conditions :

"*Second.* Ten per cent. shall be paid upon call to C. F. Woerishoffer, treasurer of the North River Construction Company, for which installment receipts, in due form, shall be given, and thereafter not more than ten per cent. shall be called at any one time. At least ten days' notice shall be given of any call, subsequent to the first call. Default in the payment of any installment called, as herein provided, shall entitle the company, at its option, to forfeit the subscription and all installments previously paid.

"*Third.* Each subscriber, upon the payment of the entire amount subscribed by him, shall, in addition to the bonds, be entitled to fifty per cent. of the par value of his subscription in certificates representing the full paid capital stock of said railway company.

"*Fifth.* After forty per cent. has been called in and paid, such subscriber may elect to surrender all his installment receipts, except one, and receive therefor thirty per cent. in said bonds, and he shall be entitled to receive bonds for each subsequent payment, upon the surrender of the installment receipts, and upon payment in full of his subscription he shall be entitled to the certificates provided for under section third.

"*Sixth.* The bonds subscribed for, under this agreement, will be deposited with the United States Trust Company for delivery to the subscribers hereto, under the terms hereinabove named, upon a surrender of their installment receipts. Interest at five per cent. per annum will be allowed on all installments paid, and will be adjusted as the bonds are delivered."

A firm intimately connected with the appellants, named Fatman & Co., were among the subscribers to this agreement for bonds of the par value of $100,000, and to that firm, after $50,000 had been paid, the construction company issued ten certificates, each of which bore date on the 26th of August, 1882, and stated that Fatman & Co. were entitled to all the rights, privileges and benefits, and subject to all the obligations, of a subscription to $10,000 in said bonds, under the agreement above referred to ; that fifty per cent. of the subscription had been paid ; that future payments and delivery of bonds must be endorsed on the certificate; that interest upon part payments had been paid to July 1st, 1882 ; that the subscription might be transferred with the consent of the construction company, and when transferred on that company's books, and the transferee should duly enter into agreement to fulfill the remaining obligations of the subscription, Fatman & Co. should be released from liability.

Watjen v. Green.

Fatman & Co. really subscribed for the appellants, but never either disclosed that fact to the construction company or obtained its consent to an assignment of their subscription. As each call was made upon Fatman & Co., they drew the money necessary to pay it, from the appellants, and paid it, except in two instances, by using their own check. They paid, in all, ninety per cent. of their subscription and received $80,000 of the bonds. Between the first and second calls upon them more than six months elapsed, and then, after another five months, a third call was made, and then the remaining calls followed at irregular intervals, about one month apart. The last payment was made on the 11th of December, 1882. On the 10th of January, 1884, the directors of the construction company resolved to call the balance due for the bonds, but, before notice was given, pursuant to their resolution, the company was adjudged to be insolvent and the defendant receiver was appointed.

On the 11th of March, 1884, the chancellor ordered that all creditors of the construction company present their respective claims, under oath, to the receiver within four months from that date. Both Fatman & Co. and the appellants had timely notice of this order, but neither of them presented a claim to the receiver. Before the order to limit the time for the presentation of creditors' claims was made, the receiver sent his chief clerk to Fatman & Co. The clerk opened the subject of his mission to a member of that firm, and, as authorized by the receiver, offered to deliver to Fatman & Co. the stock of the New York, West Shore and Buffalo Railway Company, which, according to the subscription agreement, was to go to them upon the completion of their payments, and to release them from the remaining payment for bonds, or, if they preferred to do so, allow them to buy $20,000 in bonds at par, then selling for a little more than fifty cents on the dollar, and give them the receiver's due bill for the excess of the cost over $10,000. This proposition was taken into consideration by Fatman & Co., but no answer was sent to the receiver. Subsequently the clerk was sent to the firm for the answer, and was told that it had not yet decided what course it

would pursue.    At neither of these interviews was there any disclosure of the appellants' interest in the subscription.

In the meantime the settlement proposed to Fatman & Co. was offered to other similar subscribers for bonds and accepted by them.    The due bills given in such settlements were subsequently treated as debts of the construction company, and the holders of them were paid dividends upon them after the same rate that other unsecured creditors were paid upon their claims.

At a later time the appellants sent a clerk to the receiver to obtain another .proposition of settlement, but then the receiver declined to make one, yet his chief clerk intimated that the settlement previously proposed might still be accepted.

The assets in the receiver's hands consisted almost entirely of securities of the New York, West Shore and Buffalo Railway Company.    Among them he held two hundred thousand three hundred and fifty-five shares of the capital stock of that company, its bonds of the par value of $10,000,000, and its notes, payable upon demand, for over $600,000.    Beyond these securities, the assets he held were of little value.

In June, 1884, suit was commenced to foreclose the first mortgage upon the railway and the road was placed in the hands of receivers.

This suit threatened destruction to the assets of the construction company, and it became apparent that, without some concert of action upon the part of all parties interested in the railway company, a foreclosure sale for a comparatively nominal sum would leave the company with nothing but a valueless name, and fail to produce anything for its creditors.    In this emergency the defendant applied to the court in which the foreclosure was pending and obtained leave to intervene in the suit, and then, in order to gain delay, interposed defences.    At the same time, to obtain the active assistance and co-operation of the stockholders of the construction company, by securing for them the possibility of a partial payment of their stock, in June, 1885, he called a meeting of the larger creditors of the construction company and represented to them the situation of affairs and the advantage of a compromise of their claims at an amount which would admit of

a dividend, out of the assets, to the stockholders.   The result of these overtures to the creditors was, in short, that practically all of them except the appellants, who had not presented their claim, agreed to accept one-half of their claims in full satisfaction of them.

Later, in July, the banking-house of Drexel, Morgan & Co., in New York city, proposed a scheme to the holders of the first mortgage bonds of the railway company, by which, upon a sale of the railway to the New York Central and Hudson River Railroad Company, fifty cents upon the dollar of their holdings would be paid.   The defendant became a party to the negotiations of Drexel, Morgan & Co. with the New York Central and Hudson River Railroad Company, and by means of the co-operation of the stockholders and creditors of the construction company, sold the assets of the latter company for $6,000,000 in first mortgage bonds of the West Shore Railroad Company, the purchaser at the foreclosure sale of the railway of the New York, West Shore and Buffalo Railway Company, which were guaranteed by the New York Central and Hudson River Railroad Company.   These bonds he subsequently disposed of for a fraction less than par, and, out of the proceeds of sale, was enabled to pay the creditors of the construction company the full amount that they had agreed to accept in satisfaction of their claims, and also to pay the stockholders of the same company thirty-one per cent. of the par value of their stock.

The appellants held four hundred shares of the construction company stock, and sharing in the dividends to stockholders, received thirty-one per cent. of its value from the defendant.   If the defendant had not compromised with the creditors and had been able to realize as he did from the assets in his hands, the stockholders would not have had five per cent. upon their stock. He has now in his hands sufficient assets of the construction company, in the shape of bonds of the West Shore Railroad Company and undistributed moneys, to pay the appellants' demand, but he insists that they have neither legal nor equitable right to payment.

Watjen v. Green.

The appellants claim that the construction company should have called upon them for the final payment of $10,000 on the 12th of January, 1883, and that, upon their paying that sum, they would have been entitled to receive $20,000 in first mortgage bonds of the New York, West Shore and Buffalo Railway Company, which were then worth $14,350, and $50,000 of the capital stock of the same company, then worth $14,625 ; that the total value of those bonds and stock was then $28,975, from which the $10,000 to be paid should be deducted, leaving the balance $18,975, which, with interest from January 12th, 1883, is their claim.

The first difficulty I have in approving this claim is with the arbitrary date upon which it fixes the default, January 12th, 1883. The company was not under obligation to call the final payment at any specified time. The seven months that elapsed between the first and second calls was acquiesced in by the subscribers as proper, and following that period a lapse of five months before the third call was also acquiesced in. I fail to find either in the company's necessities or practice in calling for payments, or in the terms of the subscription, anything to justify the arbitrary selection of January 12th, 1883, as the time for the last call. Nor do I think that anything has been shown which indicates that the date so fixed was a reasonable time within which the call should be made, if expiration of reasonable time can avail the appellants.

The terms of the subscription did not forbid the payment by the appellants without a call or demand upon them by the company. The provision for calls was obviously intended for the protection of subscribers against an unexpected demand. The amount of each call was limited, and the company was obliged to give a prescribed notice before it could compel payment or forfeit a subscription, but no provision in the agreement forbade the subscribers paying their entire subscription at any time and demanding of the company performance of its part of the contract. On the contrary, the sixth paragraph of the subscription agreement required the company to deposit bonds and stock to the amount of the entire subscription in advance of all payments,

and, by its very terms, exhibits that the company was to be ready to take all cash at any time, and that the calls were solely for the benefit of the subscriber. It was within the appellants' power, for more than a year before the construction company's failure, to have tendered the amount unpaid upon its subscription (*Cook Stockh.* § *106; 5 Wait Ac. & Def. 549*), and the testimony shows, that if such a tender had been made then and performance had been demanded, the construction company was able to fully perform its part of the contract. But both the appellants and the construction company remained inactive. Neither sought to put the other in default, neither made either a demand or a tender.

It is a general rule, in executory agreements for the sale of chattels, that the obligation of the vendor to deliver and that of the buyer to pay are concurrent conditions in the nature of mutual conditions precedent, and that neither can enforce the contract against the other without showing performance, or offer to perform, or averment of readiness and willingness to perform upon his own part. *Benj. Sales* (*Corbin's ed.*) § *897*.

I am unable to distinguish this case, in principle, from *Hapgood* v. *Shaw, 105 Mass. 276*, where there was an agreement to deliver some guns on the 1st of June next, or when the delivery should be ordered previous to that date, upon payment of a balance due. Until June 6th the seller did not offer to deliver or demand the balance to be paid, and the buyer did not either offer to pay or demand delivery. On June 6th the seller requested the buyer to take the guns. Two suits were brought. The seller sued for the balance due upon the guns and the buyer sued to recover back the moneys he had paid in advance. The court held that neither party was in default. Wells, J., in delivering the opinion of the court, said: " If either would charge the other upon the agreement he must put him in default. He must show a refusal by the other party to perform, or some act or neglect on his part which may be regarded as equivalent to a refusal. Unless excused from performance on his own part where the refusal of the other party to perform, or some conduct equivalent to a refusal, he must show that he has offered to perform his part of the

agreements, or at least that he gave notice of his readiness to perform or being thus ready requested performance by the other party. Failing to do that, he cannot charge the mere neglect of the other party to take any action as a refusal to perform or a breach of the agreement."

I am of opinion that at the time of the insolvency there was no breach of the subscription contract upon the part of the company of which the appellants could take advantage.

Now, coming to the receiver, it is perceived that his proposition of settlement to Fatman & Co., the only parties appearing by the books of the construction company or known to him to be interested in their subscription, was substantially an offer to perform the contract. The appellants had $10,000 to pay, for which they were to have $20,000 in bonds, rated at par, and $50,000 in stock at par. The bonds were then selling at a little more than fifty per cent. of their par value, and the receiver said, retain your $10,000 and go into the market with it and buy $20,000 worth of bonds, and I will deliver to you your stock and give you a due bill for whatever you shall pay for the bonds above $10,000, and you shall hereafter receive upon that due bill the dividends which shall be paid to other creditors of the company, or, if you prefer it, I will deliver to you your stock and release you from the payment of the $10,000, retaining the bonds that are due you.

According to the market rates then prevailing, the acceptance of either proposition of the receiver would have entailed but trifling loss upon the appellants. They, however, ignored the proposition, and, instead of making a definite demand upon the receiver, sent a clerk, in the name of Fatman & Co., to, if possible, draw from the receiver another offer of some kind. At this point further negotiations respecting the claim ceased. In the following March an order to limit the time within which claims might be presented to the receiver was made and extensively advertised, but the appellants, though aware of the limitation, suffered the time limited to pass without presenting any claim to the receiver. But after the limitation had expired more than sixteen months, and after other creditors had accepted fifty

Watjen v. Green.

per cent. of their claim in full payment of them, and after the appellants had themselves either become entitled to or actually derived advantage from the compromise with those creditors in the shape of a substantial dividend upon the stock of the construction company which they held, applied for leave to present their claim to the receiver, and, two years after his appointment, make their first demand. The court, notwithstanding the laches and questionable conduct of the appellants, allowed them to present their claim, but merely for the purpose of investigation, expressly reserving the right to refuse to admit it wholly or partially to a dividend, as justice and equity might require.

The appellants do not now offer to pay the receiver the last installment of their subscription. They have never put themselves in position, either with the construction company or with him, to legally claim a breach of the subscription agreement. They therefore stand without legal right. What right have they in equity and justice? I think precisely that which the receiver offered them immediately after his appointment; that which was accepted by others who were in a situation similar to the one now occupied by them. The appellants have retained their $10,000. With it and $650 (the proofs show that the market for the bonds at that time was fifty-three and a half cents on the dollar) they might have purchased $20,000 in bonds. The receiver should pay them the same dividend upon the $650 excess over the $10,000 that he paid other creditors—that is, fifty per cent., or $325. And he should deliver to them five hundred shares of the capital stock of the New York, West Shore and Buffalo Railway Company. He has the stock and is able to make such delivery. It is true the stock is now substantially valueless, but the company is not extinct. Costs will not be allowed to either party.